IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**JACK DAMON HOWBERT,**

   **Plaintiff,**

 v.              Civil Action 2:20-cv-3587
                 Magistrate Judge Kimberly A. Jolson

**COMMISSIONER OF
SOCIAL SECURITY,**

   **Defendant.**

## OPINION AND ORDER

Plaintiff, Jack Damon Howbert, brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB"). The parties in this matter consented to the Undersigned pursuant to 28 U.S.C. § 636(c). (Docs. 5, 6). For the reasons set forth below the Court **OVERRULES** Plaintiff's Statement of Errors and **AFFIRMS** the Commissioner's decision.

**I. BACKGROUND**

Plaintiff filed his application for DIB on April 13, 2016, alleging that he was disabled beginning October 6, 2015, due to tinnitus, fatigue, sarcoidosis, blurred vision, abnormal MRI, word finding problems, headaches, high blood pressure, white matter of the brain syndrome, and neuro-sarcoidosis. (Tr. 370–76, 410). After his application was denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held a video hearing on November 13, 2018. (Tr. 204–43). The ALJ denied benefits in a written decision on May 16, 2019. (Tr. 98–109). Then, when the Appeals Council denied review, the ALJ's decision became the final decision of the Commissioner. (Tr. 1–7).

Plaintiff filed the instant case on July 16, 2020, seeking a review of the Commissioner's decision (Doc. 1). The Commissioner filed the administrative record on December 7, 2020 (Doc. 11) and Plaintiff filed his Statement of Errors on March 12, 2021 (Doc. 14). On April 26, 2021, and May 11, 2021, respectfully, Defendant filed an Opposition (Doc. 16) and Plaintiff filed his Reply (Doc. 17). Accordingly, the matter is ripe for consideration.

### A. Relevant Hearing Testimony

The ALJ helpfully summarized the testimony from Plaintiff's hearing:

> At the hearing the [Plaintiff] testified that he is still on methotrexate and remicade. He also takes prednisone and takes a higher dose of blood pressure medications, plus supplements. He testified that he has a lot of joint pain and muscle weakness. He stated that there are days that he cannot open jars and accidently throws things on the ground. He mostly has fatigue and muscle weakness. He stated that his right hip, both knees, both feet, and both wrists all have joint pain. The pain is constant. He is on medication for pain and takes testosterone. He stated that with his medication the pain is a 5-6/10. He testified that the pain keeps him from walking and sleeping. His mobility is impaired, meaning he has issues standing, sitting, and getting in and out of the car. He has to be careful that he does not fall. He stated that he does not use an assistive device. He further testified that he has back problems and experiences back pain.

(Tr. 102).

### B. Relevant Medical Evidence

Because Plaintiff attacks only the ALJ's treatment of his physical impairments, the Court focuses on the same. The ALJ summarized Plaintiff's medical records and symptoms related to his impairments:

> The medical evidence shows that the [Plaintiff] went to the doctor in November 2015, complaining of certain symptoms including low grade temperatures, a mildly elevated heart rate, malaise, headache, and just not feeling well. His symptoms started after returning home from a honeymoon in the Caribbean (Ex. 1F/6, 28). In December 2015 he presented to the emergency department with palpitations, mild/moderate shortness of breath but no chest pain. ACTA chest showed no pulmonary embolus and mediastinal and hilar lymphadenopathy, which was unchanged to prior and multiple nodular densities. He was admitted to the hospital for observation for two days (Ex. 33F). In February 2016 he had another CT of the

2

chest that showed nodules and lymphadenopathy (Ex. 1F/48). He then went for a bronchoscopy which led to a sarcoid diagnosis (Ex. 1F/58). In April 2016, the [Plaintiff] went for [an] MRI of his brain. It showed mild nonspecific FLAIR signal abnormalities of the subcortical and periventricular white matter, greater than expected for the [Plaintiff]'s age (Exs. 1F/63, 4F/14).

In June 2016, the [Plaintiff] went to establish care at the Cleveland Clinic, specifically with Dr. Kuenzler of neurology for the sarcoidosis. He had been on prednisone and started having some symptoms when he decreased the dose. He had also gained weight and was not sleeping well (Ex. 6F/16). At that time, the [Plaintiff]'s lungs were clear to auscultation bilaterally. His musculoskeletal exam showed his joints were nontender, he had normal range of motion, and no paraspinal tenderness. His motor exam showed 5/5 neck flexion and extension, 5/5 throughout all the extremity muscle groups, normal tone and bulk, and the [Plaintiff] was able to arise from a chair without using his hands. He had some reduction in his sensory exam, such as his temperature was reduced in his right foot. His gait was intact, including a stress gait and his Romberg was negative. In her assessment, Dr. Kuenzler wrote that the [Plaintiff] has been diagnosed with sarcoidosis with pulmonary and neurological features. He had been on steroids since late April 2016 with some improvement in symptoms, but with troublesome side effects. Dr. Kuenzler wrote that she agreed there are features of mild neurological involvement in his sarcoidosis. The [Plaintiff] was to stay on prednisone and take methotrexate, plus add supplements such as calcium and folate. He was to follow up in 2-3 months (Ex. 6F/18).

In July 2016, the [Plaintiff] went to the respiratory clinic at the Cleveland Clinic where he saw Dr. Highland. It was noted that he had taken 2 doses of methotrexate and felt quite tired after each dose. At that time, the [Plaintiff]'s exam was unremarkable. His gait was normal (Ex. 6F/26). He had a spirometry which showed no obstruction. The reduced FVC suggested restriction. The diffusing capacity was normal (Ex. 6F/61). Dr. Highland found that they would trial the methotrexate and recommended that the [Plaintiff] start tapering prednisone (Ex. 6F/28).

At a follow up with Dr. Kuenzler in September 2016, the [Plaintiff] had weaned himself of prednisone and stopped taking his supplements. He reported a cough, eye drainage, and random tingling in his hands, arms, and legs. His exam remained generally unremarkable with some reduction in his sensory exam (Ex. 6F/39). Dr. Kuenzler summarized that the [Plaintiff] had recently tapered himself off steroids with some return of constitutional symptoms. Neurologically, the [Plaintiff] was stable, though there was minimal residual headache and stable sensory change in the right foot. From the neurological perspective, there was no active reason to change his medications, but since he was having constitutional symptoms, he would likely be advised to make changes when he saw Dr. Highland (of pulmonary) later that day (Ex. 6F/40).

3

The [Plaintiff] then went to see Dr. Highland. She noted that she had seen the [Plaintiff] in July and since then he had no significant events. He had been off prednisone for approximately nine days and was tolerating methotrexate. The [Plaintiff] reported some fevers and chills as well as a five[-] pound weight loss. He also reported fatigue, decreased vision, and diffusion myalgias. He had noted headache, nausea, shortness of breath, dyspnea and rash (Ex. 6F/43). At that time, his exam was unremarkable. The plan was to hold his methotrexate and recheck his labs in 2 weeks (Ex. 6F/45).

In November 2016, the [Plaintiff] went to see a rheumatologist, Dr. Antonchak (Ex. 13F). At that time the [Plaintiff]'s exam showed he had some redness/erythema in both eyes. He had tenderness in his knees and forefoot tenderness in both feet. He had moderate MCP dorsal swelling in both hands. His cervical and lumbar spines were normal. His memory showed mildly impaired short-term memory (Ex. 13F/4). He had normal x-rays of the sacrum and coccyx (Ex. 13F/8). Dr. Antonchak found that the [Plaintiff]'s joint pain did have inflammatory characteristics to it, as it included the small joints of the hand, prolonged AM stiffness, joint swelling, and warmth. The doctor noted that it was hard to say if it represented sarcoid arthritis or another inflammatory arthritis. It did not sound like osteoarthritis or myofascial. Dr. Antonchak wrote that he thought that whichever agent (Imuran or Remicade) that his neurologist and sarcoid specialist chose should help his arthritis. For the time being, his only option was to place him back on prednisone. He was to get his labs checked (Ex. 13F/2).

In January 2017, the [Plaintiff] had an updated MRI of the brain. It was stable. There was no acute infarction or masses, and no pathologic enhancement. The [Plaintiff]'s mild chronic microvascular ischemic changes were stable (Ex. 15F/6). He started Remicade infusions in March 2017 (Ex. 18F/5). His dose and frequency were adjusted in May 2017 (Ex. 18F/8). Also[,] in May 2017, he also started chiropractic treatment for lumbar discomfort (Ex. 32F).

In August 2017, the [Plaintiff] went to see Dr. Crouser of pulmonology at the Wexner Medical Center. It was noted that the [Plaintiff] had started Remicade with improvement in his neurological symptoms, but he had lingering symptoms of mental fogginess, fatigue, joint and muscle pain, tinnitus, and vision impairment. The [Plaintiff] noted that the effects of Remicade were wearing off before the next dose (every 4 weeks, and up to 7 mg/kg/dose). At that time, the [Plaintiff] appeared well and in no acute distress. His exam showed his respirations were full and nonlabored. His chest well was without deformity. His lung sounds were clear and equal to auscultation through all fields without adventitious sounds (Ex. 16F/1). Dr. Crouser noted that the [Plaintiff] had pulmonary function tests done in February 2017 that were normal. The impression was systemic sarcoidosis with involvement of the CNS, lung and lymph nodes, and possibly the heart; high risk medication use; headaches and fatigue, likely relating to sarcoidosis; and cough with exercise or exposure to dust or fumes. Dr. Crouser agreed with increasing the [Plaintiff]'s dose of Remicade to avoid antibody formation and to increase methotrexate to 10

mg daily. The [Plaintiff] was also given a trial of inhaled steroids (Ex. 16F/2). At this next follow up with Dr. Crouser in November 2017, the [Plaintiff] was found to be doing well. He was to continue his medication at his current doses (Ex. 16F/4).

In September 2017 the [Plaintiff] started treatment with the Center for Symptom Relief for complaints of chronic pain. He was started on Dilaudid (Ex. 17F/4). By December 2017, the [Plaintiff] reported that he was starting to feel better (Ex. 17F/1). His exam showed he was in no acute distress. His lungs were clear to auscultation and percussion. He had 5/5 motor strength bilaterally throughout. His gait was normal and his sensation was intact to light touch and pressure. He had paraspinal tenderness in the cervical, thoracic, and lumbar spines; plus, pain with flexion, extension, and rotation (Ex. 17F/3). The [Plaintiff] noted that he continued to use Dilaudid, but sparingly. He was encouraged by recent MRI results with "inactive" disease (Ex. 17F/1). In November 2017, due to his diagnosis, the [Plaintiff] had an MRI of his cervical spine. It showed no abnormal signal or pathological enhancement in the cervical spinal cord. There was no evidence of demyelination. It showed moderate degenerative disc disease at C5-6 and the disc bulge resulted in mild spinal canal stenosis. An uncovertebral osteophyte resulted in moderate right foraminal narrowing. An uncovertebral osteophyte on the right at C6-7 resulted in moderate right foraminal narrowing (Ex. 22F/36-37).

Also, in November 2017, the [Plaintiff] went to establish care with Dr. Nicholas, a neurologist at the Riverside Methodist Hospital. She recommended further labs and testing (Ex. 22F/9). Later that month, Dr. Nicholas recommended that the [Plaintiff] continue infliximab per pulmonary, and she did not recommend a change in dose or therapy based on his current symptoms as there was no current evidence of active neurocircuit (Ex. 22F/15).

At the [Plaintiff]'s follow up with the Center for Symptom Relief in March 2018, the [Plaintiff] reported he had "maxed out" on Remicade and was on MTX injectables. He was having some increased pain flares and trying to adjust (Ex. 20F/1). He had started yoga for arthritis. His exam again showed his lungs were clear to auscultation and percussion. His back had paraspinal tenderness and he had pain with flexion, extension, and rotation (Ex. 20F/3).

At a follow up with Dr. Antonchak of rheumatology in March 2018, the [Plaintiff] had no synovitis on exam that day, he was to continue his current treatment (Ex. 21F/1). In July 2018, Dr. Antonchak noted that joint wise, the [Plaintiff] was doing ok overall. He had a thoracic CT which showed fatty liver, decrease in hilar lymphadenopathy and new nodule development. The [Plaintiff] thought the Remicade helped despite being fatigued after the infusion (Ex. 24F/3).

The [Plaintiff] followed up with Dr. Crouser of pulmonary in September 2018. At that time, his lungs were clear to auscultation bilaterally. He had no wheezing, rhonchi, or rales. He had pulmonary function testing in May 2018 that was a normal spirometry without obstruction. His lung volumes were normal and his DLCO was

5

increased (Ex. 28F/5). The [Plaintiff] was found to be clinically stable. He had subjective shortness of breath, but had high exercise endurance as he used the stationary bike and biked over 100 miles per week. He was advised to keep using Flovent and Albuterol as needed with supportive therapy. It was noted that it was unlikely he was having pulmonary flares. His CT showed nodules, but relatively small and was likely inflammation (Ex. 28F/6). Also, in September 2018, the [Plaintiff] followed up with the Center for Symptom Relief for his pain complaints and was continued on Dilaudid (Ex. 25F/3).

The [Plaintiff] continued with chiropractic care in 2017 and though at least November 2018 (Ex. 32F). In November 2018, his exam revealed the following ranges: cervical flexion was normal, cervical extension was mild, left lateral flexion was normal, right lateral flexion was mild, left cervical rotation was normal, and right cervical rotation was normal. His ranges of motion for the lumbar spine were tested and found to be within normal limits and pain free (Ex. 32F/122).

(Tr. 102–05).

### C. The ALJ's Decision

The ALJ found that Plaintiff meets the insured status requirement through December 31, 2020, and has not engaged in substantial gainful employment since October 6, 2015, the alleged onset date. (Tr. 100). The ALJ determined that Plaintiff suffered from the following severe impairments: sarcoidosis and degenerative disc disease of the cervical spine. (Tr. 101). Still, the ALJ found that none of Plaintiff's impairments, either singly or in combination, meet or medically equals a listed impairment. (*Id.*).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ concluded that:

After careful consideration of the entire record, the undersigned finds that the [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he can frequently climb ramps and stairs, but never climb ladders, ropes, or scaffolds. He can frequently stoop, kneel, crouch, and crawl. He can frequently reach in all directions, bilaterally. He can frequently handle, bilaterally. The [Plaintiff] must avoid moving mechanical parts and unprotected heights. He cannot perform production rate or pace work. In addition to normal breaks, the [Plaintiff] would be off task no greater than 10% of time in an 8-hour workday due to fatigue.

(*Id.*).

Upon "careful consideration of the evidence," the ALJ decided that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely consistent with the medical evidence and other evidence and other evidence in the record for the reasons explained in this decision." (Tr. 105).

As for the relevant opinion evidence, the ALJ found,

[T]he state agency medical consultant at the initial level opined that the [Plaintiff] can do light work except he must be able to sit and stand at will to alleviate muscle cramps in his lower extremities (Ex. 2A). This opinion is assigned some weight. Although the undersigned finds that a range of light work is supported by the overall evidence, the need to sit and stand at will is not supported as the record does not show longitudinal, consistent complaints or issues with muscle cramps in the [Plaintiff]'s lower extremities as this opinion references. The state agency medical consultant at the reconsideration level opined that the [Plaintiff] can do light work except he can never climb ladders, ropes, or scaffolds. He can frequently climb ramps and stairs. He can frequently stoop, kneel, crouch, and crawl. He should avoid all exposure to hazards (Ex. 4A). This opinion is assigned great weight as it is generally supported by the overall evidence. As discussed above, the [Plaintiff]'s clinical findings do not support greater limitations as many of his exams are within normal limits and his gait is consistently found to be normal. Any limitations are accommodated with the limitation to light work along with the additional postural and environmental limitations.

In October 2016, Dr. Conklin, the [Plaintiff]'s primary care physician, wrote a letter. It stated that outlined the [Plaintiff]'s diagnosis and treatment of sarcoidosis, but stated that for full details of the treatment course of neurosarcoidosis and expected outcomes, which is not within his expertise, Dr. Conklin suggested contacting the [Plaintiff]'s specialist at the Cleveland clinic. Dr. Conklin wrote that unfortunately, both the symptoms associated with a diagnosis of [neurosarcoidosis] and side effects from disease modifying drugs have appeared to limit the [Plaintiff]'s ability to maintain employment. While the [Plaintiff]'s symptoms can vary in intensity from day to day, he has no reliable way to predict what days will be good versus bad. Dr. Conklin wrote that his discussions with him, the [Plaintiff] continued to experience more bad days than good days. A treatment plan that will reliably lead to a favorable outcome is elusive currently, and as such, Dr. Conklin wrote that he supported the [Plaintiff]'s application for disability (Ex. 12F). In May 2018, Dr. Conklin wrote another brief letter stating that his overall impression of the [Plaintiff]'s condition outlined in his October 2016 letter is unchanged (Ex. 23F). This opinion is assigned no weight. To begin, this is an issue reserved for the Commissioner. Second, Dr. Conklin's own treatment notes do not support severe limitations that would lead to a conclusion of disability. Neither does the overall record, which showed some improvement in his symptoms and imaging studies

7

> with treatment. For example, when the [Plaintiff] was treated by Dr. Conklin in May 2018, the physical examination noted normal gait and station with no gross motor or coordination deficits; also noted was normal wall motion of the chest/lungs with normal effort of respiration and normal chest excursion Dr. Conklin also noted the [Plaintiff]'s pneumonia had improved; encouraged the [Plaintiff] to check his blood pressure regularly; and discussed a B12 deficiency (Ex. 30F/65). Further, Dr. Conklin does not provide functional limitations. Due to all of the above, his opinions are assigned no weight.

(Tr. 106–07).

Relying on the vocational expert's testimony, the ALJ concluded that Plaintiff is able to perform his past relevant work as a waiter, as well as other light exertional jobs that exist in significant numbers in the national economy such as a process helper, a copy machine operator, or an office mail clerk. (Tr. 108–09). She therefore concluded that Plaintiff was not disabled within the meaning of the Social Security Act, at any time from his alleged onset date of October 6, 2015, through the date of her decision. (Tr. 109).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538

8

(6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

### III. DISCUSSION

At base, Plaintiff argues that the ALJ's RFC determination is not supported by substantial evidence and, as a result, remand is necessary. (*See generally* Doc. 14). More specifically, Plaintiff alleges the ALJ erred in two respects. First, he argues that the ALJ "provided no explanation for her determination that Plaintiff would be off-task no more than ten percent of an eight-hour workday due to his fatigue." (*Id*. at 7). Second, Plaintiff argues that the ALJ "failed to properly consider" his subjective complaints of disabling symptoms. (*Id*. at 9). The Court addresses each argument in turn.

A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a). The Social Security regulations, rulings, and Sixth Circuit precedent provide that the ALJ is charged with the final responsibility in determining a claimant's residual functional capacity. *See, e.g.*, 20 C.F.R. § 404.1527(d)(2) (the final responsibility for deciding the residual functional capacity "is reserved to the Commissioner"). And it is the ALJ who resolves conflicts in the medical evidence. *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984). In doing so, the ALJ will give each opinion the weight deemed appropriate based on factors such as whether the physician examined or treated the claimant, whether the opinion is supported by medical signs and laboratory findings, and whether the opinion is consistent with the entire record. 20 C.F.R. § 416.927(c). The ALJ may reject an opinion that is inconsistent with the record. 20 C.F.R. § 416.927(c)(4); *Gant v. Comm'r of Soc.*

9

*Sec.*, 372 F. App'x 582, 585 (6th Cir. 2010). Nevertheless, substantial evidence must support the Commissioner's RFC finding. *Berry v. Astrue*, No. 1:09CV000411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010).

### A. Off-Task Limitation

In his first assignment of error, Plaintiff claims that "[t]he ALJ's RFC is unsupported by substantial evidence as she provided no explanation for her determination that Plaintiff would be off-task no more than ten percent of an eight-hour workday due to his fatigue." (Doc 14 at 7). By failing to provide this explanation, Plaintiff argues, the ALJ violated her duty to "explain [her] decision with sufficient clarity so as to allow for meaningful review." (*Id*. (citing *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 249 (6th Cir. 2007)). Defendant counters that "substantial evidence supports the ALJ's RFC finding that Plaintiff would be off-task for no more than ten percent of an eight-hour workday." (Doc. 16 at 5).

Plaintiff emphasizes that the ALJ did not refer to the evidence, or otherwise explain how she determined, that Plaintiff had this off-task limitation. In support of this assertion, he claims that "the medical evidence of record showed [that he] consistently complained of fatigue throughout his treatment to several of his providers." (Doc. 14 at 8 (citing Tr. 529, 976–77, 988, 1019, 1065, 1144, 1151, 1152, 1225, 1283)). But the parts of the record upon which Plaintiff relies are not medical source opinions; rather, they are recordings of his own subjective complaints. And, as Defendant argues, "a claimant's statements about his pain or symptoms will not alone establish that he is disabled." (Doc. 16 at 5 (citing 20 C.F.R. § 404.1529(a))). Because Plaintiff "has not pointed to [medical opinion] evidence indicating that [he] needed a greater amount of off-task time . . . there was no basis for the ALJ to find that Plaintiff need[s] more than a [10]% off-task limitation." *Burton v. Comm'r of Soc. Sec.*, No. 3:19-cv-00313, 2021 WL 388768, at *4 (S.D.

Ohio Feb. 4, 2021); *see also* 20 C.F.R. § 404.1512 (establishing that claimant has the burden to provide evidence (i.e. medical treatment and examinations) to show he is disabled).

Further—and contrary to Plaintiff's arguments—it is clear why the ALJ limited Plaintiff in the way she did. In fact, the ALJ "did engage in a meaningful assessment of Plaintiff's impairments[,]" including fatigue, which would affect his ability to remain on task. *Burton*, 2021 WL 388768, at *4; (*see* Tr. 103 (citing Tr. 951, 953) (finding that while Plaintiff complained of fatigue, his exam at the respiratory clinic was unremarkable); *see also* Tr. 104 (citing Tr. 1065–68) (noting that while Plaintiff complained of fatigue at his pulmonology exam, he appeared "well and in no acute distress[,]" was prescribed further medication, and thereafter "was found to be doing well")). So while there may have been no specific medical opinion upon which the ALJ relied in determining Plaintiff's off-task limitation, she based the limitation off the record evidence and did not err in doing so. *See Reinartz v. Comm'r of Soc. Sec.*, No. 19-1584, 2020 WL 901518, at *1 (6th Cir. 2020) (rejecting the argument that "that an ALJ may not make a work-capacity finding without a medical opinion that reaches the same conclusion").

Also of note, Plaintiff argues that the off-task limitation is not supported by substantial evidence, but he fails to offer any alternative. Nowhere in his Statement of Errors or his Reply brief, does Plaintiff offer an allegedly more appropriate off-task limitation. (*See generally* Docs. 14, 17). As detailed above, Plaintiff carries the burden here. *See* 20 C.F.R. § 404.1512. By not offering an alternative off-task limitation, it is difficult for the Court to sustain Plaintiff's assignment of error.

Accordingly, the Court finds that the ALJ reasonably considered Plaintiff's impairments, including fatigue, when crafting an off-task limitation in Plaintiff's RFC. Consequently, substantial evidence supports the ALJ's finding of a 10% off-task rate limitation. *See Baker v.*

*Colvin*, No. 5:13-cv-2076, 2015 WL 1383660, at *9 (N.D. Ohio Mar. 25, 2015) (finding no reversible error where the ALJ included an off-task limitation in the RFC that was based on a hypothetical posed to the vocational expert and supported by substantial evidence).

### B. Subjective Complaints

Next, Plaintiff argues that "[t]he ALJ's RFC determination was unsupported by substantial evidence" because she improperly considered "[his] subjective complaints[.]" (Doc. 14 at 9). Specifically, Plaintiff alleges that the ALJ "failed to provide any rationalization for her analysis of [his] subjective complaints determination other than its inconsistency with the objective evidence." (*Id*. at 10). Defendant responds that the ALJ "did not simply rely on objective evidence when evaluating Plaintiff's subjective complaints, but rather also considered other salient factors, which showed he was not as limited as he alleged." (Doc. 16 at 8). Upon review of the ALJ's decision, the Court agrees with Defendant.

It is well established that the "subjective complaints of a claimant can support a claim for disability, if there is also objective medical evidence of an underlying medical condition in the record." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (citations omitted). "Nevertheless, an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Id*. (citations omitted). Recently enacted, SSR 16-3p eliminates the use of the term "credibility" and clarifies that an ALJ should consider whether the claimant's statements about the intensity, persistence, and limiting effects of symptoms are consistent with the objective medical evidence and other evidence of record. 2016 WL 1119029, at *7.

Here, the ALJ stated explicitly that Plaintiff's statements concerning the intensity, persistence, and limiting effects of his symptoms were not entirely consistent with the record. (Tr.

105). For example, the ALJ noted that Plaintiff's condition(s) "improved with treatment," and that despite some medication dosage changes, his treatment regimen remained relatively static and conservative. (*See* Tr. 106); *see also Lherisson v. Berryhill*, No. 3:17–cv–00137, 2018 WL 494411, at *5 (M.D. Tenn. Jan. 3, 2018) (citing 20 C.F.R. §§ 404.1529(c)(3)(iv), 416.929(c)(3) (2015)) (recognizing that it is not only permissible, but required, for an ALJ to consider a claimant's medication or other treatment)). Similarly, in concluding that Plaintiff's subjective complaints were not entirely consistent with the medical evidence, the ALJ also considered Plaintiff's activities of daily living. For example, the ALJ determined that while Plaintiff "has subjective shortness of breath . . . he used the stationary bike and bikes over 100 miles per week." (Tr. 105 (citing Tr. 1241)). Ultimately, as Defendant correctly argues, "the evidence of Plaintiff demonstrating a high exercise endurance . . . undermine[s] his claims that his activities of daily living were 'limited.'" (Doc. 16 at 8). Given these inconsistencies, and the thoroughness with which she discussed them, the Court finds the ALJ did not fail to properly consider Plaintiff's subjective complaints and accordingly her RFC is supported by substantial evidence.

Ultimately, Plaintiff asks this Court to re-weigh the evidence relating to his impairments and decide the outcome of this case differently. This request is impermissible under the substantial evidence standard of review. The Court may not undertake a *de novo* review of the Commissioner's decision or re-weigh the evidence of record. *Bradley v. Sec'y of Health and Human Serv.*, 862 F.2d 1224, 1228 (6th Cir. 1988); *Young v. Sec'y of Health and Human Servs.*, 787 F. 2d 1064, 1066 (6th Cir. 1986); *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996). Even if this Court would have decided the case differently, it must give deference to the ALJ and affirm her findings if substantial evidence supports them. *Id.* Because substantial evidence supports the ALJ's analysis and conclusion here, the Court is required to affirm the Commissioner's decision.

IV. **CONCLUSION**

For the foregoing reasons, the Court **OVERRULES** Plaintiff's Statement of Errors and **AFFIRMS** the Commissioner's decision.

IT IS SO ORDERED.


Date: June 17, 2021                                    /s/ Kimberly A. Jolson
                                                      KIMBERLY A. JOLSON
                                                      UNITED STATES MAGISTRATE JUDGE